R. Alan **DECKEBACH**, et al., Plaintiffs,

v.

La **VIDA CHARTERS, INC.** et al., Defendants.

Civ. No. 1–86–648.

United States District Court, S.D. Ohio, W.D.

July 30, 1987.

George F. Carr, Jr., Milford, Ohio, for plaintiffs.

Michael L. Gay, Cincinnati, Ohio, for defendants.

## ORDER

CARL B. RUBIN, Chief Judge.

This matter is before the Court on cross-motions for partial summary judgment. (Doc. nos. 15, 17). The issue before the Court is whether plaintiffs' purchase of a yacht and attendant management agreement with defendants constitutes a security under federal or Ohio state securities laws.

## FACTS

The parties have stipulated to the following facts. (Doc. 18, Appendix I; Doc. 20) Plaintiffs, Ohio residents, negotiated with George Bell to buy a Pearson 36 Cutter owned by B & H Yacht Ventures, a partnership in which Bell was a partner. At that time, the yacht was harbored in St. Thomas, Virgin Islands under a management program with La Vida Charters. On several occasions in the past, plaintiffs had chartered yachts from La Vida Charters and had in fact been given Bell's name by the Dixons, owners of La Vida Charters.

Plaintiff agreed to buy the yacht. As a part of the deal, the parties agreed that George Bell would trade-in the yacht to La Vida Charters as a downpayment on the purchase of a new yacht and that La Vida Charters in turn would sell the yacht to plaintiffs. The sale was structured in this way to obtain favorable tax treatment for B & H yacht ventures. Plaintiffs also entered into a management agreement with La Vida Management Co., Inc., whereby La Vida Management agreed to harbor, charter and maintain the yacht for a fee. This management agreement was terminable by either side upon 60 days written notice.

La Vida Management also managed a number of other vessels for different owners. For charter purposes the vessels were classified by size and type. La Vida Management assigned charters by giving priority to vessels in each class which had been free and available for the longest period of time. Owners' use of the vessels was not restricted except where a pre-existing charter contract had been confirmed. Each owner received the profits from the charter of his or her own vessel less fees and expenses.

## SUMMARY JUDGMENT

Plaintiffs allege that the sale of the Pearson 36 Cutter with the attendant management agreement, constitutes a sale of a security under federal and Ohio state securities law. Defendants contend that the sale of the yacht and the management agreement were separate transactions and that even if viewed together, the scheme does not constitute a security under either federal or Ohio state securities law.

*Federal Securities Law*

A security is defined for purposes of the Security Act of 1933 in 15 U.S.C. § 77b(1) and for purposes of the Securities Exchange Act of 1934 in 15 U.S.C. § 78c(a)(10).[1] Plaintiffs allege that the entire transaction involving the sale of the Pearson 36 Cutter and execution of the management agreement for its charter and maintenance falls under the "investment contract" definition of a security. The test to be applied to determine whether a particular scheme is an investment contract for

---

1. 15 U.S.C. § 77b(1) provides:

    (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security" or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

    15 U.S.C. § 78c(a)(10) provides:

    (10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

    Although the definitions vary slightly, the Supreme Court has treated them as "virtually identical." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 2302 n. 1, 85 L.Ed.2d 692 (1985); *Marine Bank v. Weaver*, 455 U.S. 551, 555 n. 3, 102 S.Ct. 1220, 1223 n. 3, 71 L.Ed.2d 409 (1982); *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

purposes of federal securities law was set out in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *See also United Housing Foundation v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

The three part *Howey* test requires: (1) an investment of money; (2) in a common enterprise; (3) in an expectation of profits that will be derived solely from the efforts of others. 328 U.S. at 298–99, 66 S.Ct. at 1102–03. Even considering the sale and the management agreement as an integrated scheme, it fails to meet the second prong of the *Howey* test.[2] The United States Court of Appeals for the Sixth Circuit has interpreted the "common enterprise" prong of the *Howey* test as requiring a showing of horizontal commonality.

> Horizontal commonality ties the fortune of each investor in a pool of investors to the success of the overall venture. [citation omitted] In fact, a finding of horizontal commonality requires a sharing or pooling of funds.

*Union Planters National Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). *See also Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001 (6th Cir. 1984).

In *Hart v. Pulte Homes*, the Sixth Circuit declined to find a common enterprise where individuals separately purchased 23 model homes and leased them back to the developer on the expectation that their investment would increase in value. The Court held that even assuming the individual purchasers had been assured of development, "the fortunes of individual purchasers were [not] inextricably intertwined by contractual or financial managements." *Id.* at 1004. Moreover, the Court found

that although an assurance of development to each investor may have come from the same seller, that alone does not satisfy the requirement of horizontal commonality. No link existed among the investors as to their investment of funds or the risks they undertook. *Id.* at 1004–05.

Plaintiffs in the present case are similarly situated. There was no pooling of profits or proration of losses among the yacht owners under the management agreement with La Vida. *See Curran v. Merrill Lynch, Pierce, Fenner and Smith*, 622 F.2d 216 (6th Cir.1980) (no pooling of interests in discretionary commodity accounts therefore no common enterprise). Plaintiffs' profit or loss was derived solely from the charter of their own yacht. The purchase of the yacht and the agreement for management services with La Vida at best constitutes vertical commonality since each yacht owner has an independent contract with La Vida and plaintiffs have made no showing of an interrelation with any other yacht owners.[3] The mere fact that La Vida Management allocated charters within each class of vessels on a rotational basis does not suggest that the fortunes of the individual owners were "inextricably intertwined" as required by the Sixth Circuit. *Hart v. Pulte*, 735 F.2d at 1004. Nor have plaintiffs made a showing that the fortunes of each investor were tied to the success of an overall venture. *Union Planters National Bank*, at 1183.

Therefore, the Court concludes that the sale of the yacht and the agreement for management services with La Vida fail to exhibit the horizontal commonality required to meet the common enterprise prong of the *Howey* test and thus cannot be termed a security under federal securities laws.

---

**2.** The Court is mindful of the Supreme Court's admonition that the substance of the transaction, i.e., "the economic realities" should determine whether this arrangement is a security. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851–52, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

**3.** The Sixth Circuit has rejected the view held by the Fifth and Ninth Circuits that vertical commonality is sufficient to create a common enterprise. *Union Planters National Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

## Ohio Blue Sky Law

A security is defined under Ohio law in O.R.C. § 1707.01(B).[4] Like the federal securities laws, Ohio law includes an "investment contract" within its definition of a security. Ohio's test for an investment contract is somewhat broader, however, than the test set out by the United States Supreme Court in *Howey*. *State v. George*, 50 Ohio App.2d 297, 362 N.E.2d 1223, 1227 (1975). An investment contract is created whenever:

(1) an offeree furnishes initial value to an offeror,

(2) a portion of the initial value is subjected to the risks of the enterprise,

(3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and

(4) the offeree does not receive the right to exercise practical and actual control over managerial decisions of the enterprise.

*Peltier v. Condo-Mobile, Inc.*, (unreported) No. 79AP–747 (Ct.App., Franklin Cty., 1980); *Leeth v. Decorator's Manufacturing, Inc.*, 67 Ohio App.2d 29, 425 N.E.2d 920 (1979); *State v. George*, 50 Ohio App.2d 297, 362 N.E.2d 1223 (1975); *Peltier v. Koscot Interplanetary, Inc.*, (unreported) No. 72 AP–220 (Ct.App., Franklin Cty., 1972). All four elements must be present before an investment contract will exist. *George*, 50 Ohio App.2d at 304, 362 N.E.2d at 1228. Under the facts stipulated to by the parties in the present case, the transactions involving the Pearson 36 Cutter fail in several respects to satisfy the second, third and fourth elements of an investment contract. First, each of these elements requires the existence of an enterprise. While Ohio courts have not discussed what comprises an enterprise, the Tenth District Court of Appeals recently refused to find a security in *Abel Investments v. Sheridan*, (unreported) No. 85AP–1104 (10th Dist.Ct.App.1986) [Available on WESTLAW, OH–CS database]. In *Abel Investments* plaintiffs purchased three video games and entered into a management contract for the management of these games. The management contract granted the promoter exclusive right to operate and manage the games for three years. The Court of Appeals affirmed the trial court's determination that such a scheme was a business opportunity rather than a security under laws of Ohio. Similarly, the purchase of the yacht and management agreement with La Vida are at most a "business opportunity" under Ohio law and not a security because the scheme lacks the horizontal commonality required to create an enterprise.

While the non-existence of an enterprise is dispositive of the issue, the court also notes that plaintiffs did have the right to exercise practical and actual control over the managerial decisions of La Vida. Plaintiffs' use of their yacht was not restricted except in the event of a pre-existing charter contract. Plaintiffs could, and in fact did, on at least one occasion, forgo a charter opportunity to use the yacht themselves. Moreover, the management agreement itself was terminable upon sixty days

---

**4.** (B) "Security" means any certificate or instrument which represents title to or interest in, or is secured by any lien or charge upon, the capital, assets, profits, property, or credit of any person or of any public or governmental body, subdivision, or agency. It includes shares of stock, certificates for shares of stock, voting-trust certificates, warrants and options to purchase securities, subscription rights, interim receipts, interim certificates, promissory notes, all forms of commercial paper, evidences of indebtedness, bonds, debentures, land trust certificates, fee certificates, leasehold certificates, syndicate certificates, endowment certificates, certificates or written instruments in or under profit-sharing or participation agreements or in or under oil, gas, or mining leases, or certificates or written instruments of any interest in or under the same, receipts evidencing preorganization or reorganization subscriptions, preorganization certificates, reorganization certificates, certificates evidencing an interest in any trust or pretended trust, any investment contract, any instrument evidencing a promise or an agreement to pay money, warehouse receipts for intoxicating liquor, and the currency of any government other than those of the United States and Canada, but such sections shall not apply to bond investment companies or to the sale of real estate.

notice. Plaintiffs could cancel the management agreement and still retain possession of the boat.

Accordingly, the court finds that the sale of the yacht and management agreement with La Vida did not possess the requisite elements of an investment contract and is therefore not a security under Ohio law.

### RICO Claims

Plaintiffs' claims under RICO, 18 U.S.C. § 1962, are predicated on violations of state and federal securities laws only.[5] Because the court has determined that no securities transactions were involved, plaintiffs have failed to demonstrate that defendants' activities fall within the definition of "racketeering activity" in RICO and these claims must also fail. See *Dumbarton Condominium Association v. 3120 R Street Associates*, 657 F.Supp. 226 (D.D.C.1987).

### CONCLUSION

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment if after sufficient time for discovery, the party against whom the motion was filed fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

For the foregoing reasons, the Court determines that plaintiff has failed to make any showing that the scheme involving the Pearson 36 Cutter meets the common enterprise prong of the *Howey* test for an investment contract and thus does not constitute a security under the laws of Ohio.

Finally, because plaintiffs' claims against defendants under RICO, 18 U.S.C. 1962, are predicated on violations of state and federal securities violations, such RICO claims must also fail.

Accordingly, the Court grants defendants' motion for partial summary judgment and denies plaintiffs' motion for partial summary judgment. Plaintiffs' claims based on violations federal securities law, state securities law and RICO are hereby dismissed.

IT IS SO ORDERED.

---

**5.** RICO claims may also be predicated upon mail fraud or wire fraud, but neither has been